SAVANNAH RIVER LUMBER CO., FOR ITSELF AND ITS PREDECESSOR, SAVANNAH MERCANTILE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAVANNAH RIVER LUMBER CO., AS TRANSFEREE OF THE ASSETS OF THE SAVANNAH TIMBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14354, 16130, 26936. Promulgated November 14, 1928.

*James W. Mudge, Esq.*, and *J. B. Ely, Esq.*, for the petitioners.
*L. C. Mitchell, Esq.*, and *M. E. McDowell, Esq.*, for the respondent.

166

174

OPINION.

SMITH: The question presented by these proceedings is that of the affiliation of the following corporations for the years 1917 to 1922, inclusive:

Savannah River Lumber Co.
Savannah River Sales Co.
Savannah Mercantile Co.
Savannah-New York Transportation Co.
Savannah Timber Co. (hereinafter referred to as the Savannah Group).
Port Wentworth Lumber Co.

The specific issue raised in Docket No. 14354 is the affiliation of the Savannah Mercantile Co. with the other companies for 1917, and in Docket No. 16130 of the Savannah Timber Co. with the other companies for 1921.

The statutory provisions relating to affiliation for 1917 are different from those relating to the years 1918 to 1921. For convenience of treatment the affiliation status of the companies for the later period will be first considered.

The respondent's brief admits that he has allowed affiliation of the Savannah River Sales Co., the Savannah River Mercantile Co., and the Savannah-New York Transportation Co., for the years 1918, 1919, and 1921. The respondent objects vigorously to the affiliation of the Savannah Timber Co. with the Savannah River Lumber Co. for the year 1921 and for the other years involved. The respondent's brief does not cover the question of the affiliation

of the Port Wentworth Lumber Co. with any other company for any of these years.

In support of their contention that all of these companies were affiliated for the years 1918 to 1921, the petitioner submits and the evidence of record supports, the following:

1. All of the corporations, with the exception of the Port Wentworth Lumber Co., constituted a single economic enterprise, the Savannah River Lumber Co. being the successor of the Hilton-Dodge Lumber Co., and the other corporations having been organized as subsidiaries of the Hilton-Dodge Lumber Co., each to conduct some department of its business, separate incorporation being merely a matter of convenience and expediency.

2. The Port Wentworth Lumber Co., while not historically part of a single economic enterprise with the Savannah River group of corporations, was so situated in respect to its timber holdings as to constitute in fact a natural part of the same enterprise and for that reason was made part of the same enterprise by deliberate act of its promoters.

3. All of the corporations maintained constant intercompany relationships and engaged continuously in intercompany transactions of a complicated and far-reaching character, very largely on an artificial basis independent of market standards, so that it is impracticable to determine the true net income of the several corporations involved except through consolidated returns.

4. Substantially all the stock of the several corporations was owned or controlled by Lee, Higginson & Co., as follows:

(a) *Savannah River Lumber Co.*—More than 99 per cent of the stock of this company was controlled by Lee, Higginson & Co., through the Savannah River Lumber Co. voting trust, established under an agreement dated May 1, 1916. One of the three voting trustees was a partner in Lee, Higginson & Co., acting constantly as its direct representative; another was a nominee of Lee, Higginson & Co. who, in view of the circumstances and particularly the dependence of the Savannah River Lumber Co. upon Lee, Higginson & Co. for extensive financial support, left the control of the stock to Lee, Higginson & Co.; and the third was the head of the banking house associated with Lee, Higginson & Co. in the purchase and sale of the bonds, which associated banking house had bound itself by formal contract to allow Lee, Higginson & Co. to have the management of the entire Savannah River matter. The voting trust instrument itself carefully provided that any removal of a trustee and any appointment of a successor trustee should be subject to the approval of Lee, Higginson & Co., and gave the power to remove the entire board of trustees and appoint a new board, to the directors of the

Savannah River Lumber Co., acting with the approval of Lee, Higginson & Co. All of the Savannah River Lumber Co. directors were, throughout the taxable years in question, including the year 1917, selected by Lee, Higginson & Co., practically all of them being either partners, employees or attorneys of Lee, Higginson & Co., or their close business associates serving as directors at their request.

(b) *Savannah Timber Co.*—More than 99 per cent of the common stock of this company was owned by the Savannah River Lumber Co. and controlled by Lee, Higginson & Co. through its control of the Savannah River Lumber Co. and also through Lee, Higginson & Co.'s control of the board of directors of the Savannah River Lumber Co., all the members of which had been selected by Lee, Higginson & Co., and more than 80 per cent of whom were in every year, including 1917, closely affiliated with Lee, Higginson & Co. Lee, Higginson & Co.'s control of the common stock of the Savannah Timber Co. was reenforced and confirmed by the circumstance that that stock was pledged with Lee, Higginson & Co. for its claims on account of its advances to the Savannah River Lumber Co. and allied companies. All of the preferred stock of the Savannah Timber Co. was either owned by the Savannah River Lumber Co., and accordingly controlled by Lee, Higginson & Co. in the same way as the common stock of the Savannah Timber Co., or was owned directly by Lee, Higginson & Co. itself.

(c) *Savannah River Sales Co.*—More than 98 per cent of the stock of this company was owned by Lee, Higginson & Co. for the purpose of controlling the operations of the Sales Co., and for the benefit and protection of the holders of countersigned notes and of the endorsements or guaranties of lumber notes and receivables, and of the banks. While Lee, Higginson & Co. had agreed that this stock should be returned to the Savannah River Lumber Co. when all of the Sales Company's debts were paid it was made entirely clear that meanwhile the control of the stock was in Lee, Higginson & Co. This control persisted till after the close of 1921.

(d) *Savannah Mercantile Co.*—More than 98 per cent of the stock of this company was owned by the Savannah River Sales Co. and was controlled by Lee, Higginson & Co. through its control of the Savannah River Sales Co. Such control through the Sales Co. was reenforced and confirmed by the circumstance that the stock of the Mercantile Co. was pledge with Lee, Higginson & Co. for its claims on account of advances to the Savannah River Lumber Co. and allied companies.

(e) *Savannah-New York Transportation Co.*—More than 99 per cent of the stock of this company was owned by the Savannah River Sales Co. and was controlled by Lee, Higginson & Co. through its

control of the Savannah River Sales Co., such control through the Sales Co. being reenforced and confirmed by the circumstance that the stock of the Savannah-New York Transportation Co. was pledged with Lee, Higginson & Co. as security for its claims on account of advances to the Savannah River Lumber Co. and allied companies.

(f) *Port Wentworth Lumber Co.*—More than 99 per cent of the stock of this company was controlled by Lee, Higginson & Co. through the Port Wentworth Lumber Co. voting trust, two out of the three voting trustees representing Lee, Higginson & Co. The third trustee, though not representing Lee, Higginson & Co., desired their cooperation in management and their financial assistance, and acquiesced in their policies.

Section 240(b) of the Revenue Act of 1918 and section 240(c) of the Revenue Act of 1921 provide that:

> \* \* \* Two or more domestic corporations shall be deemed to be affiliated \* \* \* if substantially all the stock \* \* \* is owned or controlled by the same interests.

The petitioner contends that they were affiliated for the years 1918 to 1922, inclusive, upon the ground that substantially all of the stock of these corporations was " owned or controlled by the same interests."

The respondent, confining his brief to the question of the affiliation of the Savannah Timber Co. with the Savannah River Lumber Co., admits that the individual stockholders of the Lumber Co. were helpless; that Lee, Higginson & Co. was the only financial hope of the Lumber Co.; that there was no reason for these stockholders through their voting trustees to interfere with or oppose Lee, Higginson & Co.'s suggestion. He submits, however, that the stock of the Lumber Co. was owned by public stockholders, namely, the former bondholders of the Hilton-Dodge Lumber Co.; that the stock of the Timber Co. was 84 per cent owned by the Lumber Co., and 16 per cent by Lee, Higginson & Co., that the harmony between all of the stockholders of these companies was one created more by the poverty of the situation than that of friendly participation.

In *Isse Koch & Co.*, 1 B. T. A. 624, we stated that:

> \* \* \* The object sought to be accomplished by Congress, in enacting section 240 of the Revenue Act of 1918, was to tax as a business unit what really was a business unit, \* \* \*

We there laid down the proposition that the control required by the statute is actual, practical control, not legal control. In this and in numerous other cases the Board has established the following general principles relating to the meaning of control.

(1) The control required is not legal control but actual, practical control.

(2) The control must be genuine and must be actually exercised.

(3) The control required is control of the stock, not merely control of the corporate entities or businesses.

(4) Control of the corporate entities or businesses, their management and policies, while not the ultimate control referred to in the statute, is a "significant circumstance" as bearing upon the question of identity of interest to stockholding groups.

(5) Intercompany transactions and relationships, particularly on an artificial basis, and economic unity, while not in themselves decisive, have an important bearing upon the question of control, and a situation which will not constitute control in the absence of intercompany transactions and relationships may constitute control where such intercompany transactions and relationships exist, particularly if they are on an artificial basis.

The Board has decided each affiliation case which has come before it upon its own peculiar facts. The proceedings at bar present somewhat different facts from those in any case heretofore decided by the Board. The facts in some cases, however, present a close parallel. In *Stanley Insulating Co.*, 2 B. T. A. 967, we held that the petitioner was affiliated with the Finance & Trading Corporation during the year 1920. The latter corporation held two-thirds of the stock of the Stanley Insulating Co. The remaining third of the stock of Stanley Insulating Co. was held by syndicate managers representing 14 individuals, and although the syndicate managers were largely interested in the Finance & Trading Corporation, the 14 individuals who had contributed funds of the syndicate were not interested in the Finance & Trading Corporation. The situation there presented is not unlike the situation obtaining in the instant proceedings, with voting trustees representing holders of beneficial interests therein in place of syndicate managers representing syndicate members. The voting rights in the stock held by the syndicate managers were legally in the syndicate managers just as in the present proceedings the voting rights held by the voting trust were legally in the voting trustees. The syndicate agreement vested the manager with the fullest and broadest authority, just as the voting trust here vested the voting trusteees with the fullest and broadest power and authority. The Board held that the corporations were affiliated.

In *Empire State Finance Corporation*, 6 B. T. A. 1322, the facts were that all of the stock of the petitioner was held by three voting trustees and the question of affiliation depended altogether upon the actual control of the stock so held. Legal control of the stock was given by the trust instrument to the three trustees acting for the majority of their number. One of the three voting trustees, Jones, was principal stockholder in the Finance Exploration & Development Corporation; another of the trustees, Barker, was an

attorney and close business associate of Jones; the third trustee, Tucker, represented other interests. The Board held that the companies were affiliated.

In *Huyler's, et al.*, 8 B. T. A. 13, three brothers held one-third of the stock of Grammercy Investing Co. of New York in their individual capacity (that is, as owners in their own several rights), and likewise each held 7⅓ per cent of the stock of Huyler's in their own several rights. The same individuals held 64 per cent of the stock of Huyler's in the capacity of trustees. The Board held that the holdings of the three brothers, on the one hand in their own right, and on the other hand as trustees, constituted both " the same interests " and that the two corporations were affiliated. This holding was made in spite of the fact that there was a minority interest in Huyler's of 14 per cent.

The economic unity of the Savannah River group of companies is clearly established. The control of the stocks of these companies by Lee, Higginson & Co. during the years 1918 to 1921, inclusive, is likewise clearly established. On behalf of the respondent it is objected that the purpose motivating Lee, Higginson & Co. in the control of these companies was the protection of its investment clientele to the extent of returning to the investors in the original Hilton-Dodge Lumber Co. bonds, which it had floated, their investments in those bonds and to repay to its friends, the lender banks, the amounts of money which the bankers had been induced by them to advance to the Savannah River situation. We think, however, that the purpose motivating Lee, Higginson & Co. is immaterial. The control was actually exercised by Lee, Higginson & Co. Certainly Lee, Higginson & Co. constitutes " the same interests " referred to in the statute, since there is no other interest exercising any control. The Savannah group of companies was, therefore, affiliated for the · years 1918 and 1921.

The claim of the Port Wentworth Lumber Co. to affiliation with the Savannah River group of companies is possibly not so strong as that of the Savannah Timber Co. with the other members of the Savannah River group. More than 99 per cent of the stock of this company was held by three trustees acting in the name of the Port Wentworth Lumber Co. voting trust. The Port Wentworth Lumber Co.'s origin was independent of the Savannah River group and its original promoters had no connection with the other companies involved. Because of its independent origin one of the three Port Wentworth Lumber Co. trustees was an individual wholly independent of Lee, Higginson & Co., and for the same reason the Port Wentworth Lumber Co. voting trust instrument does not contain provisions that the removal of trustees and the appointment of all

successor trustees shall be subject to the approval of Lee, Higginson & Co.

The evidence discloses, however, that the Port Wentworth Lumber Co. constituted an economic part of a single unity along with the Savannah River group of companies. Two of the trustees were under the domination and control of Lee, Higginson & Co. The third trustee, the direct representative of the original promoters, perceived the necessity of unified control and acquiesced fully in Lee, Higginson & Co.'s domination. This is indicated by the following testimony of George Cabot Lee, a partner of Lee, Higginson & Co.:

Q. Has Mr. Imbrie ever expressed to you any dissatisfaction in respect to the domination of Lee, Higginson & Company in the affairs of the Port Wentworth Lumber Company, or any opposition to Lee, Higginson & Company in connection therewith?

A. On the contrary, he highly approved it. * * *

Q. * * * What has Mr. Imbrie said to you on that subject?

A. He said that he was right behind us in any actions we might take in regard to the Port Wentworth and Savannah River Lumber Company.

Q. In view of the inter-relations between the Savannah River group of corporations, and the Port Wentworth Company, as to inter-connected timber operations, as to inter-company financing, etc., could the affairs of all of the companies have been worked out with mutual justice and advantages without common control of management and stock?

A. It would have been impossible.

Q. Would you personally have been willing to become and remain the principal executive of the Port Wentworth Lumber Company, upon the understanding that that Company was to be managed independently of the Savannah River group, or was to be under a different control?

A. I would not have accepted it.

The evidence shows that as time went on the Port Wentworth Lumber Co. merged completely with the Savannah River corporations, in the matter of control and management. This is indicated by the increased extent to which the Port Wentworth Lumber Co. was financed by the Savannah River companies. Thus, although at the end of 1916 the amount loaned to the Port Wentworth Lumber Co. by the corporations comprising the Savannah River group was only $40,978, by the end of 1918 these loans had increased to $334,439; at the end of 1919 they stood at $383,248; and on December 31, 1921, they amounted to $457,589.

The above facts we think show the affiliation of the Port Wentworth Lumber Co. with the Savannah River group of companies for the years 1918 and 1921, the two years subsequent to 1917 directly involved in these proceedings.

Section 1331(b) of the Revenue Act of 1921, construing the Revenue Act of 1917, provides as follows:

For the purpose of this section a corporation or partnership was affiliated with one or more corporations or partnerships (1) when such corporation or

partnership owned directly or controlled through closely affiliated interests or by a nominee or nominees all or substantially all the stock of the other or others, or (2) when substantially all the stock of two or more corporations or the business of two or more partnerships was owned by the same interests: *Provided,* That such corporations or partnerships were engaged in the same or a closely related business, or one corporation or partnership bought from or sold to another corporation or partnership products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or one corporation or partnership in any way so arranged its financial relationships with another corporation or partnership as to assign to it a disproportionate share of net income or invested capital. * * *

Under subdivision (1) of section 1331(b) the petitioners claim affiliation for 1917 covering the Savannah River Lumber Co., the Savannah River Sales Co., the Savannah Mercantile Co., and the Savannah-New York Transportation Co., this claim for affiliation being based upon the ownership by the Savannah River Lumber Co. of substantially all of the stock of the Savannah River Sales Co. coupled with ownership (conceded by the respondent) by the Savannah River Sales Co. of substantially all the stocks of the Mercantile Co. and the Transportation Co. Under subdivision (2) of section 1331(b) the petitioner claims affiliation covering all of the six corporations involved (namely, the entire Savannah River group and the Port Wentworth Lumber Co.), this claim for affiliation being based upon the claim that Lee, Higginson & Co., the two voting trusts (Savannah River Lumber Co. voting trust and Port Wentworth Lumber Co. voting trust), the Savannah River Lumber Co., and the Savannah River Sales Co. constituted " the same interests." It is contended that the Savannah River Lumber Co. voting trustees constituted " the same interests " with Lee, Higginson & Co., because those trustees were, and were intended by all parties to be, merely an instrumentality of Lee, Higginson & Co. for the control and management of the Savannah River group of companies; and that the stock held by the trustees was controlled by Lee, Higginson & Co. in exactly the same capacity and in exactly the same way as was such stock held in the name of Lee, Higginson & Co. (for example the stock of the Sales Co.). It is further contended that the Port Wentworth Lumber Co. voting trustees constituted " the same interests " with Lee, Higginson & Co. because of the three trustees, two of whom were actual nominees of Lee, Higginson & Co. (connected with the situation only through their connection with Lee, Higginson & Co.), looking exclusively to Lee, Higginson & Co. in all matters. The third trustee, because of his recognition of the independence of the Port Wentworth Lumber Co. for successful development upon cooperation with the Savannah River Lumber Co. and the Savannah Timber Co., their management and financial sponsors, cooperated throughout with Lee, Higginson & Co. It is further con-

tended that the Savannah River Lumber Co. and the Savannah River Sales Co. were both " the same interests " with Lee, Higginson & Co., the board of directors of both companies being selected and dominated by Lee, Higginson & Co., all of the stock of both corporations being controlled by Lee, Higginson & Co., and both corporations being units in the general corporate system, all elements of which were directed through Lee, Higginson & Co. toward a common object.

Considering, first, the contention of the petitioner with respect to affiliation under subdivision (2) of section 1331(b) of the Revenue Act of 1921, it is to be noted that affiliation is not made to depend upon *control* of the stock of the different corporations but is made to depend upon *ownership*. This fact is recognized by counsel for the petitioner. He submits, however, that there can be little question that Poole & Co. and Lee, Higginson & Co. were " the same interests; " that their original connection with the Savannah River affairs arose from exactly the same facts; that their interest in the situation throughout was supported by exactly the same motives, and that Poole & Co. had, in at least two formal agreements, contracted with Lee, Higginson & Co. that they should represent them. It is also submitted that since the legal ownership of the Savannah River Lumber Co. stock was in the voting trustees, of whom one was a partner of Lee, Higginson & Co. and another, Clark L. Poole, was president of Clark L. Poole & Co., all stock owned by those voting trustees was owned by the same interests as the stock owned by Lee, Higginson & Co.; that even the third trustee, a nominee of Lee, Higginson & Co., was almost as clearly part of " the same interests " ; that all of these various individuals and corporations were working towards a common end, namely, the common good of the entire enterprise, and that the case is ruled by the decision of the Board in *Rishell Phonograph Co.*, 2 B. T. A. 229, wherein the Board stated at page 233:

\* \* \* When two persons are guided in their action by a common interest (in the objective sense), they frequently constitute a single interest (in the subjective sense). \* \* \*

On behalf of the respondent it is submitted that the ownership of the Lumber Company's stock was in the hands of many independent owners, namely, the bondholders of the Hilton-Dodge Lumber Co., most of whom had deposited their holdings with trustees under the voting trust of May 1, 1916, while the ownership of the shares of stock in the Mercantile Co. was in Lee, Higginson & Co.

It is not necessary for us to consider in this case whether the ownership referred to in the statute is the legal ownership or the equitable

ownership. If the latter is referred to there is no contention made that the former bondholders of the Hilton-Dodge Lumber Co. were "the same interests" as Lee, Higginson & Co. But if the legal ownership is referred to we think that the trustees were not the same interests as Lee, Higginson & Co. Admittedly both were looking out for the interests of the beneficial owners of the stocks of all of the companies but clearly the trustees were required to look out for the interests of their beneficiaries against the interests of all others. The mere fact that Lee, Higginson & Co. controlled the voting rights of the stock and had the actual management of all of these companies during the year 1917, does not in our opinion constitute the owners of the stock of the different corporations "the same interests" within the meaning of subdivision (2) of section 1331(b) of the Revenue Act of 1921. The interests of the several actual owners of the shares of stock were divergent.

The petitioner submits, however, that if it is denied an affiliation status under subdivision (2) of the above quoted section of the statute, the Savannah River Lumber Co., the Savannah River Sales Co., the Savannah Mercantile . Co., and the Savannah-New York Transportation Co. were affiliated under subdivision (1) of the section. The evidence shows that all of the stock of the Mercantile Co. and the Transportation Co. was owned by the Savannah River Sales Co.; it further shows that the stock of the Sales Co. was owned by the Savannah River Lumber Co. It is true that this stock was not carried in the name of the Savannah River Lumber Co. during the year 1917, it having been transferred by the Lumber Co. to Lee, Higginson & Co. in September, 1916, in order that Lee, Higginson & Co. might hold it as security for the advances made by it and by the other creditors of the Sales Co. (Poole & Co. and the banks which had made loans at the request of Lee, Higginson & Co.). This transfer to Lee, Higginson & Co. was, however, only a transfer by way of security, the equitable ownership remaining in the Savannah Lumber Co. The evidence further shows that the control of the stock was to accompany the ownership of Lee, Higginson & Co. rather than the equitable ownership of the Savannah River Lumber Co.

A case involving facts similar to those present in the instant case was before the Circuit Court of Appeals of the Fifth Circuit in *Lavenstein Corporation* v. *Commissioner*, 25 Fed. (2d) 375, wherein the court stated:

* * * The statute provides for affiliation where there is unity of either ownership or control and does not require that there be unity in both. To so hold would be to amend the statute in a vital particular. * * *

The evidence shows that the Savannah River Lumber Co. either owned directly or controlled through closely affiliated interests all of

the stock of the Savannah River Sales Co., the Savannah Mercantile Co., and the Savannah-New York Transportation Co. The deficiency of the Mercantile Co. for the year 1917 should be redetermined upon the basis of the affiliation of these four corporations.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*